IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 2:11-cr-00092-MEF -CSC |
| | ) | |
| JERRY JAMES DUMAS | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. Introduction**

On May 26, 2011, Jerry James Dumas was charged as a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Now pending before the court is Dumas's August 24, 2011 motion to suppress all physical evidence and statements, and the fruits thereof, obtained as a result of an investigative stop that occurred on January 25, 2010, at JR's Motel in Tallassee, Alabama, in the Middle District of Alabama. (Doc. 13). Dumas contends that the investigative stop was made without reasonable suspicion of criminal activity, in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. After careful consideration of the motion and briefs of the parties, as well as the evidence and arguments presented at the September 29, 2011 hearing on the motion, the court concludes that the motion to suppress is due to be denied.

**II. Facts**

The material facts are largely undisputed. Officer Michael Knowles of the Gulf State Regional Task Force[1] received a tip from a confidential informant that Derrick Calhoun, a

---

[1]The Gulf State Regional Task force is a partnership of nine local and state agencies, as well as the
(continued...)

black male fugitive sought by the task force, had been seen in a small dark-colored car with another black male. (Doc. 27 p. 6). The confidential informant also informed Officer Knowles that Calhoun was staying in Room 4 of JR's Motel in Tallassee, Alabama, with his girlfriend, Cynthia Braskins, who is white and who was wanted by the local police. (Doc. 27 pp. 5-7). JR's Motel is a "strip hotel" with approximately only six rooms. (Doc. 27 p. 6).

After receiving the tip, Officer Knowles drove by JR's Motel on January 25, 2010 and observed a dark colored Chevrolet Tahoe (a sport utility vehicle) and a small gray car parked in front of Room 4. Officer Knowles called the Gulf State Regional Task Force to inform them that Calhoun and Braskins were staying in Room 4 of JR's Motel. (Doc. 27 p. 6). He also informed them that Calhoun had been seen in a small dark car with another black male (Doc. 27, pp 16-17), and that he had seen a dark-colored Tahoe and a small gray car parked outside Room 4 of JR's Motel. (Doc. 27 p. 17). Other Task Force members subsequently arrived at the hotel; when they arrived, the Tahoe and the small gray car were no longer there. (Doc. 27 p. 6). After sunset, at 7:00 p.m. on January 25, 2010, the Task Force members set up surveillance in the parking lot of the hotel.[2] *Id*. They were looking for Calhoun, and also for Braskins with the idea that finding Braskins would lead to finding Calhoun. (Doc. 27, pp. 15-16, 19). The Task Force members had with them photographs of Calhoun and Braskins

---

(...continued)
United States Marshall's Service. (Doc. 27, pp. 4-5). The Task Force assists state and local agencies with arresting violent offenders and sexual predators. *Id.*

[2]On January 25, 2010, the lot surrounding JR's motel was strewn with debris, and old cars were in the parking lot. (Doc. 27 p. 6.) In setting up surveillance, the Task Force officers parked their unmarked police vehicles amongst the old cars and "blended in." *Id.*

to aid in recognizing them if they saw them.  (Doc. 27, pp. 8, 16).

At approximately 7:30 p.m. (Doc. 27 pp. 8-9), the dark-colored Tahoe, which Officer Knowles had observed earlier, backed into a parking space in front of Room 4 of JR's Motel. (Doc. 27 p.7).  The Tahoe was occupied by two black males.  (Doc. 27 p. 8).  As the Tahoe was backing into the parking space, a small gray car also pulled into the parking lot and parked in front of Room 4.  (Doc. 27 p.7).  The gray car was occupied by a white female and a black male.  (Doc. 27 p. 9).  The white female left the gray car and approached Room 4. (Doc. 27 pp. 26-27).   To United States Marshall Scott Sides, the Task Force supervisor (Doc. 27 p. 4), "[b]ased on when the dark Tahoe backed in, it appeared they were waiting on the occupant of the gray car because they didn't get out of the vehicle."  (Doc. 27 p.7). Marshall Sides then gave the command for the officers to converge on the Tahoe and the small gray car and detain the occupants for identification.  (*See* Doc. 27 pp. 33).

Believing that Calhoun or Braskins were likely in the gray car or the Tahoe, the Task Force officers turned on their emergency lights, approached the Tahoe and the gray car, identified themselves as law enforcement officers, and instructed the occupants to raise their hands.  (Doc. 27 p.7).  The occupants of the Tahoe did not raise their hands for "several seconds." *Id*.  Two officers removed the driver from the Tahoe, and two officers opened the passenger door to remove the passenger from the Tahoe.  (Doc. 27 p. 9).  As they opened the passenger door, they saw a pistol lying on the floorboard of the Tahoe between the passenger seat and the door.  *Id*.

Once the occupants of the Tahoe and the small gray car were out of the vehicles, the

officers identified them. (Doc. 27 p. 10). None of them were Calhoun or Braskins. *Id*. The officers identified the passenger of the Tahoe as Jerry Dumas. *Id*. The driver of the Tahoe informed the officers that the pistol in the Tahoe belonged to Dumas. (Doc. 27 pp. 10-14). A criminal records check revealed that Dumas was on probation for a felony in Macon County, Alabama. (Doc. 27 pp. 10-11). The Task Force members contacted the Macon County parole officer because a weapon had been found with Dumas in the Tahoe. (Doc. 27 p. 11). Dumas was then taken into custody for violating parole because he was found in possession of a weapon. *Id*.

On September 29, 2011, the court held an evidentiary hearing in this case. During that hearing, Marshall Sides, who was one of the officers who pulled Dumas from the Tahoe, testified during the following exchange:

> [DEFENSE ATTORNEY]: Okay. So once [the white female] got out of the [small gray] vehicle, were you able to identify her?
>
> [MARSHALL SIDES]: No, sir, other than the fact that she was a white female getting out of a car in front of room four.
>
> [DEFENSE ATTORNEY]: Gotcha. So it really then comes down to her being a white female, and then the occupants of the Tahoe being black males. And you're looking for a white female and a black male.
>
> [MARSHALL SIDES]: Based on the information that we received from the confidential informant saying that our Derrick Calhoun and Cynthia Braskins was staying in room four, and that the Tahoe and the gray car were seen in front of room four previously on that day. And then those two cars coming back to room four.
>
> [DEFENSE ATTORNEY]: Okay. What information did you have that tied Ms. Braskins and/or Mr. Calhoun to the small gray car and the ... Tahoe? You just testified that the information that you had was Mr. Calhoun was in a small

> dark colored car. ....
>
> There was no information that tied -- You didn't have any information that tied Ms. Braskins and/or Mr. Calhoun to that dark Tahoe or that gray car.
>
> [MARSHALL SIDES]: Because they were occupying those vehicles that were previously parked in front of room four. So we believed the occupants of room four, who are believed to be Derrick Calhoun and Cynthia Braskins, were in one of those vehicles. So we were looking for the dark colored small car, the gray car and the Tahoe.
>
> And I'm not sure at the time we didn't know if the gray car would have been the dark colored car that was described. If they were one and the same or two separate vehicles. So all of those vehicles were in play. We were looking for our suspects, possibly identifying one of those vehicles.
>
> [DEFENSE ATTORNEY]: The truth is, you really didn't know that much. The only thing you knew for certain, you were looking for a white female and a black male?
>
> [MARSHALL SIDES]: That were occupying that room. The information that we had.

(Doc. 27 pp. 27-28).

At another point in the hearing, the court sought further clarification from Marshall Sides regarding the officers' basis for stopping the occupants of the Tahoe and the small gray car:

> THE COURT: Well, however you phrase it here's the thing that bothers me at this juncture. If my notes are correct, and I'm sure that Mr. Court Reporter will get us a copy of this as quickly as he can, but Officer Sides testified that the confidential informant, whether that was [Officer] Knowles or whoever it was, had said that earlier Mr. Calhoun had been seen in a small dark car.
>
> Officer Knowles testified that the information was that Mr. Calhoun had been seen in one of those two vehicles [the Tahoe or the small gray car] riding around. Now, gentlemen, that makes a big difference. So with that, I want to see if we can clarify that.

> So, [Marshall] Sides, come back up and take the stand again. I'll remind you you're still under oath. ...
>
> With regard to that question, what was your information about Mr. Calhoun and him having been seen in any kind of vehicle prior to the time that you and the other officers approached those two cars at the motel?
>
> THE WITNESS: Based on my report and my recollection, he had been seen earlier that day in a dark colored small car. And the connection to the Tahoe and the gray car was that it was at the hotel earlier that day. Both those vehicles were parked in front of room four. So in my mind, all those three vehicles were all in play, that our suspect could possibly be in any of those three vehicles just because they were associated with room four based on what the confidential information told us.

(Doc. 27 pp. 59-60).

Marshall Sides also testified regarding the officers' decision to remove the occupants from the vehicles before identifying them:

> [DEFENSE ATTORNEY]: Okay. You indicated that there was some hesitation with regard to the occupants about getting their hands up.
>
> [MARSHALL SIDES]: That's correct.
>
> [DEFENSE ATTORNEY]: Okay. So you were able to see into the vehicle to at least establish that they had gotten their hands up, correct?
>
> [MARSHALL SIDES]: That's correct.
>
> [DEFENSE ATTORNEY]: Okay. So at that point in time you had flashlights on, guns drawn, you certainly could then identify because you said you had photos of Mr. Calhoun; why couldn't you just then look into the truck and recognize that neither one of those individuals was the individual you were looking for?
>
> [MARSHALL SIDES]: At that point when you're approaching, after we've given commands and we're at a heightened sense of alert because they're not wanting to raise their hands, my -- our mission at that time is safety. I'm not attempting to identify anybody at that time.

[DEFENSE ATTORNEY]: I understand. But you could identify them without pulling them out of the truck. Did you not need to pull them out of the truck.

[MARSHALL SIDES]: To identify them, yes, that's why we pulled them out of the truck. We needed to identify them.

....

[DEFENSE ATTORNEY]: Okay. Did you take out the photograph and -- knew what he looked like, obviously, when you were getting ready to converge on him.

[MARSHALL SIDES]: Sure.

[DEFENSE ATTORNEY]: So you could have looked into that truck, identified each of those individuals and said this is not the guy we're looking for. You could have done that?

[MARSHALL SIDES]: I would not have held the photograph up.

[DEFENSE ATTORNEY]: Fair enough. But you could have still done that, correct?

[MARSHALL SIDES]: If I would have stood there with the photograph outside the truck, yes, I could have. But we're not going to do that and I'm not going to let any of my guys do that for safety reasons.

THE COURT: Why not? You say "for safety reasons." Explain that.

[MARSHALL SIDES]: One reason, they were reluctant to raise their hands so that raised my awareness that something was wrong. They're not raising their hands for some reason. In the past it's either they are hiding some type of evidence, some drugs, or they're hiding a weapon. That's why I'm more cautious. When someone raises that sense of alertness, that we're going to make sure we do everything we can for our safety. That comes first. We're going to secure everything first, and then we identify everybody. Because it's just as easy for someone to have their hands up like this while I'm standing there, reach down and grab a gun. I'm not going to allow somebody to endanger myself or the guys I work with.

[DEFENSE ATTORNEY]: Okay. So you're saying that effectively as a matter

7

of procedure, you're going to pull up on individuals who you may or may not know are individuals that you are looking for, and you're going to, for safety concerns, pull them out of their vehicle?

[MARSHALL SIDES]: Yeah. It all depends on the circumstances. In this particular case, yes, that's what we needed to do.

(Doc. 27 pp. 20-23).

### III. Discussion

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity." *United States Pruitt*, 174 F.3d 1214, 1219 (11th Cir. 1999) (quoting *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)). "Where police have been unable to locate a person suspected of involvement in a past crime, [they have] the ability to briefly stop that person, ask questions, or check identification," and "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). In addition, where a police officer reasonably suspects "that the persons with whom he is dealing may be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868.

Reasonable suspicion "is obviously considerably less than proof of wrongdoing by a

preponderance of the evidence, *INS v. Delgado*, 466 U.S. 210, 217 (1984), or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. [*United States v. Sokolow*, 490 U.S. 1, 7 (1989)]." *Tapia*, 912 F.2d at 1370. On the other hand, "reasonable suspicion" must be more than an inchoate "hunch." *Id*. (citing *Sokolow*, 490 U.S. 1 at 7). Reasonable suspicion requires "'at least a minimal level of objective justification for making the stop.'" *United States. v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). It does not require officers to catch the suspect in a crime. Instead, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (citing *Illinois v. Wardlow*, 528 U.S. 199, 125-26 (2000); *Terry*, 392 U.S. at 22–23).

   The "reasonable suspicion" standard requires that, to justify an investigatory stop, a police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, at 21 (footnote omitted)); *see also United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989) (citing *Sokolow*, 490 U.S. at 7) (holding that reasonable suspicion "requires that the police articulate facts which provide some minimal, objective justification for the [investigatory] stop."). When assessing the facts articulated by an officer to determine whether an investigatory stop is warranted, a court must view them in totality and cannot engage in a "'divide-and-conquer analysis[.]'" *United States v. Bautista-Silva*, 567 F.3d 1266, 1273-74 (11th Cir. 2009). Reasonable suspicion may exist based on the totality of the circumstances

9

even if each individual fact articulated by the officer, standing alone, is susceptible of an innocent explanation. *Id*.; *see also United States v. Arvizu*, 534 U.S. 266, 274-75 (2002); *Acosta*, 363 F.3d at 1145 (quoting United States v. Gordon, 231 F.3d 750, 754 (11th Cir.2000) ("'[A] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.'"). Moreover, the "totality of the circumstances" giving rise to reasonable suspicion may be based the "'collective knowledge of the officers involved in the stop,'" *Acosta*, 363 F.3d at 1145 (quoting *Williams*, 876 F.2d at 1524), and "officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

At the September 29, 2011 hearing on the motion to suppress, Marshall Sides stated several factors that led him to suspect that Calhoun or Braskins would be in the gray car or the Tahoe. First, Calhoun had been seen earlier that day riding in a small dark-colored car with another black male. (Doc. 27 p. 6). Second, a confidential informant had tipped the task force that Calhoun (who was a black male) and Braskins (a white female) were staying in Room 4 of JR's Motel. (Doc. 27 pp. 5-7). Third, both the Tahoe and the gray car were seen in front of room four previously on that day. (Doc. 27 pp. 27-28). Fourth, the officers saw both Tahoe and the gray car return and park in front of Room 4 at around 7:30 p.m. (Doc. 27 pp. 27-28). In addition, the officers were looking for one white female and a black male who had been seen recently with one other black male, and the Tahoe and the gray car

contained one white female and a total of three black males. (*See* Doc. 27 pp. 27-28). Given these factors, according to Marshall Sides,

> [W]e [the Task Force] believed the occupants of room four, who [were] believed to be Derrick Calhoun and Cynthia Braskins, were in one of those vehicles. So we were looking for the dark colored small car, the gray car and the Tahoe.
>
> And I'm not sure at the time we didn't know if the gray car would have been the dark colored car that was described. If they were one and the same or two separate vehicles. So all of those vehicles were in play. We were looking for our suspects, possibly identifying one of those vehicles.

(Doc. 27 pp. 27-28).

> Marshall Sides further explained:
>
> Based on my report and my recollection, he had been seen earlier that day in a dark colored small car. And the connection to the Tahoe and the gray car was that it was at the hotel earlier that day. Both those vehicles were parked in front of room four. So in my mind, all those three vehicles were all in play, that our suspect could possibly be in any of those three vehicles just because they were associated with room four based on what the confidential information told us.

(Doc. 27 pp. 59-60).

The court must decide whether, taken together and in light of the Task Force officers' experience, the factors articluated by Marshall Sides gave rise to "reasonable suspicion, grounded in specific and articulable facts," that at least one of the occupants of the vehicles that pulled up to Room 4 on the night of January 25, 2010 was wanted for a crime (*i.e.*, that the vehicles contained either Calhoun or Braskins). *See Hensley*, 469 U.S. at 229; *see also Arvizu*, 534 U.S. at 273 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the

'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.").

The court finds that, under the totality of the circumstances known to the Task Force officers, *Acosta*, 363 F.3d at 1145, and in light of the officers' experience and training, *Arvizu*, 534 U.S. at 273, it was reasonable for the Task Force to suspect that the Tahoe and/or the gray car contained one or more of the occupants of Room 4. As Marshall Sides explained, both vehicles had been seen earlier in the day outside Room 4, both vehicles left the motel, and both vehicles then returned together and pulled up to Room 4 at 7:30 p.m. Common sense and ordinary experience would lead one to reasonably suspect that the vehicles that came and went from the parking spaces in front of a certain hotel room, the same vehicles that returned there in the evening, were occupied by people who were staying in that motel room. *See Cortez*, 449 U.S. at 418 (holding that reasonable suspicion "does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers").

Dumas argues, however, that the Task Force did not have a sufficient basis to conclude that Calhoun and Braskins were occupants of Room 4. Specifically, Dumas argues that "the Task Force Officers, had done nothing to corroborate the information provided by the confidential informant," and that the officers were required to corroborate the tip pursuant to *Alabama v. White*, 496 U.S. 325 (1990) (Doc. 26 p. 6). However, according to

the portion of the record cited by Dumas in support of his argument, the tip <u>was</u> corroborated by a police officer in Shorter, Alabama. (Doc. 27 p. 18). Moreover, the informant in this case was a confidential informant, unlike in *White* where the information came from an anonymous informant. *Compare Roviaro v. United States*, 353 U.S. 53 (1957) (confidential informants are informants whose identities are known but not disclosed by the police), *with White*, 496 U.S. at 229-330 (holding that, because "an <u>anonymous</u> tip alone seldom demonstrates the informant's basis of knowledge or veracity" and "the veracity of persons supplying <u>anonymous</u> tips is by hypothesis largely unknown, and unknowable," <u>anonymous</u> tips cannot, without some corroborating information, form the basis of reasonable suspicion (emphasis added)). Based on the record, the court finds that the information from the confidential informant provided the Task Force with a reasonable basis to suspect that Calhoun and Braskins were staying in Room 4 of JR's Motel.

Because the Task Force had a reasonable basis to suspect that Calhoun and Braskins were staying in Room 4, and because they had a reasonable basis to suspect that the Tahoe and/or the small gray car were carrying occupants of Room 4, the Task Force had reasonable suspicion, supported by specific, articulable facts, to detain the occupants of the Tahoe and the small gray car for purposes of identification. *Hensley*, 469 U.S. at 229 (holding that, "[w]here police have been unable to locate a person suspected of involvement in a past crime, [they may] briefly stop that person, ask questions, or check identification," and "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a

13

*Terry* stop may be made to investigate that suspicion"); *see also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) ("[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable.").

Further, the court notes that the officers were reasonable in removing the occupants of the vehicles prior to identifying them, given that they reasonably suspected that at least one of them was a known felon, and also because, based on Marshall Sides's observation and experience, securing the occupants prior to identification was necessary for safety reasons. (Doc. 27 pp. 20-23). During this process, the handgun was discovered in plain sight; meanwhile the identification and records check of Dumas indicated that he was on parole for a felony. As the United States Supreme Court stated in *Terry*:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. *Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken*.

*Terry* 392 U.S. at 30-31 (emphasis added).

Accordingly, the court finds no basis to suppress any physical evidence and

statements, or the fruits thereof, obtained as a result of a police traffic stop that occurred on January 25, 2010, at JR's Motel in Tallassee, Alabama, in the Middle District of Alabama.

## CONCLUSION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that the motion to suppress filed by defendant Jerry James Dumas be **DENIED**. It is further

**ORDERED** that the parties shall file any objections to the this Recommendation within a period of 14 days from the date this Recommendation is mailed or transmitted electronically to them. A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive or general objections will not be considered. Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

Done this 28th day of October, 2011.

      /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

15